IN THE DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) ) ) |
| vs. | ) ) Case No.  3:24-cv-07125-CMC ) |
| STATE OF SOUTH CAROLINA, | ) ) |
| Defendant. | ) ) ) ) ) |

**COMPLAINT**

1. The United States brings this action to enforce the rights of adults with serious mental illness ("SMI") to receive services in the most integrated setting appropriate to their needs. The State of South Carolina ("State" or "South Carolina") administers and funds its programs and services for adults with SMI in a manner that results in their unnecessary institutionalization in Community Residential Care Facilities ("CRCFs") in violation of Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12132–34.

2. Over 1,000 South Carolinians with SMI are unnecessarily segregated in CRCFs due to the State's failure to make community-based services available to them, and more are regularly admitted to these settings.

3. People with SMI can typically live in integrated settings in the community, but they may need help managing their mental health conditions. For example, some people with mental health conditions, like bipolar disorder or schizophrenia, may need support taking their medications

consistently. Others may need help finding and maintaining housing or securing and sustaining employment.

4. More integrated and appropriate alternatives to CRCFs exist that offer support for these needs in the community. These alternatives include supportive housing—integrated, community-based housing that provides tenants with all the rights of tenancy combined with supportive services to help individuals with SMI secure and maintain stable housing—and mental health services to support people with SMI living in the community.

5. South Carolina funds and administers services for low-income residents who have SMI through Medicaid and other public funding.

6. Although these services could support people with SMI in living successfully in the community, South Carolina does not provide adequate community-based services to avoid unnecessary institutionalization in CRCFs.

7. Instead, it relies on segregated CRCFs to serve individuals with SMI. These facilities, also known as "adult care homes", are congregate settings where people with disabilities have limited choice and independence and rarely engage with the broader community.

8. South Carolinians with SMI move into CRCFs after experiencing mental health crises, psychiatric hospital stays, or the inability to access the community-based services they need. Many others remain in CRCFs unnecessarily.

9. Most South Carolinians with SMI who have moved to CRCFs could live at home, either alone or with family or friends, if they could access community-based services.

10. The vast majority of South Carolinians with SMI would not oppose transitioning to a more integrated setting if provided an opportunity to do so.

11. Moving into a CRCF not only separates people from their communities, but also deprives them of the ability to make basic choices about their daily lives. For example, most CRCF residents cannot choose who they live with, what they eat, or how they spend their days.

12. The State could prevent discrimination against South Carolinians with SMI by changing its policies and practices to ensure that people have the information they need to make a meaningful choice about moving into a CRCF; making services in the community more reliably available; and actively supporting people to move back to the community.

13. Under Title II of the ADA, 42 U.S.C. § 12132, the United States brings this lawsuit, seeking a judicial order compelling the State to make reasonable modifications to its services for low-income South Carolinians with SMI. Changes to the State's policies and practices would enable many more South Carolinians with SMI to live in their own homes, contribute to their communities, and develop and maintain bonds with their friends and loved ones.

## JURISDICTION

14. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, because it involves claims arising under federal law. *See* 42 U.S.C. § 12133. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201–02.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to this action occurred in the District of South Carolina. 28 U.S.C. § 1391(b).

## PARTIES

16. Plaintiff is the United States of America.

17.     Defendant, the State of South Carolina, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131–34, and its implementing regulation, 28 C.F.R. Part 35.

### STATUTORY AND REGULATORY BACKGROUND

18.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id*. § 12101(a)(2).

19.     For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. § 12132.

20.     Title II of the ADA prohibits discrimination on the basis of disability by public entities. A "public entity" includes any state or local government, as well as any department, agency, or other instrumentality of a state or local government, and it applies to all services, programs, and activities provided or made available by public entities, such as through contractual, licensing, or other arrangements. *Id*. § 12131(1); 28 C.F.R. § 35.130(b)(3)(i).

21.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134. The Title II regulations include an "integration mandate," which requires public entities to "administer services, programs, and activities in the most integrated

setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." *Id.*, App. B, at 711 (2020).

22. In *Olmstead v. L.C.*, the Supreme Court held that Title II prohibits the unjustified segregation of individuals with disabilities. 527 U.S. 581, 597 (1999). The Court explained that its holding "reflects two evident judgments." *Id.* at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

23. Under Title II, as interpreted by the United States Supreme Court in the *Olmstead* decision, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected individuals do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other people with disabilities. *Id.* at 607.

24. All conditions precedent to the filing of this Complaint have been satisfied. Fed. R. Civ. P. 9(c); 28 C.F.R. Part 35, Subpart F. The United States received a complaint of discrimination about South Carolina's overuse of CRCFs to provide services to people with serious mental illness. Following an investigation under Title II of the ADA, the United States notified the State of its conclusion that South Carolina fails to provide services to adults with mental illness in the most integrated setting appropriate to their needs as required by the ADA. The letter provided the

State notice of its failure to comply with the ADA and identified the steps necessary for the State to meet its obligations pursuant to federal law. The United States determined that South Carolina's compliance with the ADA cannot be secured by voluntary means.

**OVER A THOUSAND ADULTS WITH SMI RESIDE IN SEGREGATED CRCFS IN SOUTH CAROLINA WITH MORE SEEKING ADMISSION EACH MONTH.**

A. *The State pays for, licensees, and operates CRCFs, which are segregated settings.*

25. South Carolina made CRCFs a significant part of its mental health service system. The State funds and oversees approximately 362 State-run or State-licensed CRCFs licensed for ten or more beds; additionally, there are smaller separately licensed facilities clustered together and administered as one facility. Over 1,000 individuals with SMI receive state subsidies to live in these South Carolina CRCFs with ten or more beds, and many seek admission to these CRCFs each year to access the services they need.

26. The South Carolina Department of Public Health licenses, inspects, and monitors CRCFs.

27. The South Carolina Department of Health and Human Services ("DHHS") administers the Optional State Supplementation ("OSS") program, and its companion, the Optional Supplemental Care for Assisted Living Participants ("OSCAP"). These two programs pay for room, board, and services provided by CRCFs to individuals with disabilities.

28. OSS and OSCAP payments are state-funded and may only be used toward the cost of residing in a segregated CRCF, rather than in the community. Thus, the State subsidizes a significant portion of the cost of providing care to many CRCF residents with SMI.

29. The South Carolina Department of Mental Health ("DMH") directly operates eight CRCFs for individuals with SMI. The State serves approximately 80 individuals at any one time in these facilities.

30. At the eight DMH-run CRCFs, all residents have SMI. Even at private CRCFs that are licensed by the State, people exclusively live alongside others with SMI and other disabilities.

31. CRCFs vary in size, with some licensed for over 100 beds. Of the adults with SMI in these CRCFs, nearly half reside in facilities licensed for 25 beds or more.

32. Residents have little to no control over their daily activities. Many facilities monitor residents' movement within and near the facility itself using security cameras in the common areas and on the exterior of the building. Staff determine when and what residents eat. Residents typically live in shared rooms with little privacy or choice of roommate.

33. CRCFs also limit independence and autonomy in other ways. For instance, medication is distributed to all residents, and residents may not store their own medication. Residents thus lack experience in knowing when and how to take their medications. And individuals living in CRCFs typically do not cook their own meals because regulations require a medical professional's permission for a CRCF resident to cook.

34. CRCFs isolate individuals from the broader community. These facilities are often located in areas where residents cannot safely walk or take mass transit to destinations in the local community. Some CRCFs are even fenced in. For example, at least one has a padlocked front gate, and another has a gate with an alarm that sounds upon exit.

35. CRCF residents have limited to no interaction with individuals without disabilities other than facility staff. They rarely leave CRCFs to attend social, recreational, vocational, or religious activities of their choosing outside of the facility, in part because CRCF staff make meals and medications available only at specific times on site. CRCF staff take residents on occasional trips to stores like Walmart or Dollar General. Residents generally do not visit other locations in the

community for more substantive engagement or contact with people without disabilities. Instead, they often spend their days watching television in common areas or smoking on outdoor patios. Many residents do not leave the facility at all except for medical appointments. Some residents even receive medical services on-site.

36.     The State has long been on notice that CRCFs are segregated settings. Public filings from a lawsuit brought by Disability Rights South Carolina include a 2016 report noting that the State's "ongoing reliance on CRCFs and other congregate settings, calls into question South Carolina's ability to ensure that individuals with disabilities are living in the most integrated settings." The report also noted that the State's continued use of OSS in CRCFs "may make South Carolina vulnerable for Olmstead activity." *AW et al. v. McGill et al.*, No. 2:17-cv-01346-RMG, Doc. 26-12 at 5, 11 (D.S.C. Apr. 3, 2018).

   B.   *The State's policies and practices result in individuals entering or remaining in CRCFs.*

37.     Many South Carolinians with SMI move to CRCFs to access the services they need. Changes in personal circumstances, like a mental health crisis or psychiatric hospital stay, can create a need for additional community-based services that goes unmet, driving unnecessary institutionalization in CRCFs.

38.     In addition to the need for community-based services, people remain in CRCFs because DMH Community Mental Health Centers ("CMHCs"), which each provide services for a given set of counties, set unnecessary requirements for transition to the community. Requiring people to be symptom-free or medication-compliant contributes to unnecessarily long CRCF stays. This approach ignores the community-based services that support individuals in the community. Rather than identifying community-based services, like Assertive Community Treatment

("ACT"), to meet people's needs, the State often confines its assessment to whether the person can transition to independent housing without services.

39.     CRCF stays may also be extended because State staff expect a resident to demonstrate specific independent living skills before transitioning. For someone who wants to transition to the community and live independently, DMH CRCF staff sometimes assign the person tasks to prove they have the ability to perform skills before discharge. Instead, the State could assist people in transitioning, with the support of services to help them develop skills once in the community.

40.     The State does not focus on transitioning people out of CRCFs. As noted in the State's Continuity of Care policy, South Carolina views CRCFs as having an "important role . . . in providing residential care for persons with mental illnesses." The policy further states that DMH intends to "provide needed treatment in local communities whenever possible" but relies on CRCFs as discharge destinations from State-run psychiatric hospitals.

41.     On paper, DMH notes that the goal is for everyone with mental illness to "live as independently as possible," which "may include obtaining employment and moving from the CRCF to more independent living where they assume responsibilities for the activities of daily living such as cooking, laundry, etc." Despite this stated goal, DMH relies on CRCFs to serve many people with SMI and fails to provide the support necessary to help CRCF residents move to an integrated setting.

42.     DMH employees who engage in transition planning for people who leave the two State-run psychiatric hospitals often send people directly to CRCFs. For example, in February 2024,

the DMH Office of Transition Programs assisted with the discharge of 25 individuals from a State psychiatric hospital. This included 8 individuals that the State placed in a CRCF.

43.    South Carolina has further incentivized placement in CRCFs above and beyond its OSS and OSCAP payment. South Carolina also created an enhanced CRCF rate meant to encourage CRCFs to accept people who are discharging from the State psychiatric hospitals and have a history of repeated readmissions to these hospitals. The State pays an additional $30 to $40 per bed per day to CRCFs in this program.

44.    The State knows that there are many people with SMI in CRCFs. In April 2024, the State identified 953 people in CRCFs receiving some DMH services. There are additional people with SMI in CRCFs receiving OSS and OSCAP and the associated CRCF services who are not currently receiving DMH services.

### THE VAST MAJORITY OF SOUTH CAROLINIANS WITH SMI ARE QUALIFIED TO RECEIVE SERVICES IN INTEGRATED SETTINGS AND WOULD NOT OPPOSE PLACEMENT IN SUCH SETTINGS.

45.    South Carolinians who are Medicaid-eligible adults who live in CRCFs, or who need community-based mental health services to avoid unnecessary CRCF admission, are individuals with disabilities that substantially limits one or more major life activities, as defined in 28 C.F.R. § 35.108.

46.    These individuals are qualified to receive community-based services.

47.    If they were provided with access to the community-based mental health services described above, many of these individuals could and would live in integrated, community-based settings, and could avoid placement in CRCFs.

48. Community-based services are appropriate for the vast majority of these individuals. As of July 2021, CMHCs were reportedly serving in the community nearly 6,100 adults whose level of need for support was four on a scale of one to five, and more than 500 adults with a level of five, with five indicating the most intensive level of need. Given this capacity to serve individuals with intensive needs for mental health services in the community, the State could support more people in integrated settings who are diverted from, or transition from, CRCFs. In fact, DMH's "mission and policy is to support the recovery of people with mental illness, serving them in the most appropriate, integrated, and least restrictive setting consistent with professional standards, needs, and individual choice."

49. The State designed its CMHC services to serve people with a wide range of needs in the community. These services include supportive housing, ACT, peer support, supportive employment, and crisis services, which are aimed at people with the most significant needs.

50. Many of these individuals, if presented with individualized, realistic alternatives to CRCF placement, would not oppose receiving services in community-based settings.

51. Providing choice includes offering alternatives that are realistic and specific to the individual, which enables the person to make an informed choice about whether to remain in a segregated setting.

52. Even with minimal discussion about what services might be available in the community, interviews with a sample of people living in CRCFs indicated that nearly 80 percent did not oppose moving to the community.

53. Beginning in October 2023, DMH had initial conversations with some of the people it was serving who live in CRCFs. Through these conversations, DMH identified close to 200

people who wanted to leave, confirming that there are significant numbers of people who do not oppose moving to most integrated settings.

54.     Essentially all those individuals who currently live in the community would choose to continue receiving services in the community if the State improves access to those services.

### PROVIDING SERVICES IN INTEGRATED SETTINGS CAN BE ACCOMMODATED THROUGH REASONABLE MODIFICATIONS OF THE STATE'S EXISTING SERVICES.

55.     South Carolina can implement reasonable modifications that would enable many of its current CRCF residents to transition to, and live successfully in, the community and that would prevent numerous other South Carolinians with SMI from unnecessarily entering CRCFs.

56.     Individuals with SMI often need access to a variety of services to avoid unnecessary institutionalization. For CRCF residents to transition into the community, most would need alternative services. South Carolina provides these very services to some people with SMI in the State.

   A. *Existing Community-Based Services*

57.     South Carolina uses Medicaid financing to fund and administer services like ACT, peer support, and individualized support to regain community living skills. These services are generally designed to be provided in community-based settings (*e.g.*, in their private owned or rented home) and to support stable community living for people with SMI.

58.     Medicaid is a health care system created by federal law but administered by states who are subject to certain federal statutory requirements. In broad terms, Medicaid's purpose is to provide government-funded health coverage and related services for low-income individuals and individuals with disabilities. When these individuals receive authorized services from providers that are enrolled with Medicaid, the providers' costs are reimbursed with Medicaid funds. In

South Carolina, the State contributes approximately 30% of the costs, while the federal government contributes 70%. *See* 88 Fed. Reg. 81090 at 81092.

59.     Federal law requires every state that participates in Medicaid to designate a state agency to administer its Medicaid services. That agency must create a "Medicaid State Plan," which describes and defines the services that it will cover through Medicaid. These services are called "medical assistance."

60.     DHHS is the state agency that administers South Carolina's Medicaid system. Through DHHS, the State has created a Medicaid State Plan that covers the Medicaid-funded services relevant to this matter.

61.     DMH provides mental health services through 16 state-operated CMHCs. Generally, CMHC catchment areas cover two or three counties.

62.     DMH establishes the list of services provided through its regional network of CMHCs and oversees that system of services, many of which are also included in the State's Medicaid program and reimbursed through Medicaid. Currently, the CMHCs provide supportive housing, ACT, peer support, supported employment, crisis services, psychiatric and psychological services, independent living skills services, and case management.

63.     Supportive housing offers housing, typically scattered throughout the community, along with services aimed at meeting the individual's needs. CMHCs can provide a variety of services to people in supportive housing, depending on their specific needs to support them in maintaining stable housing and in accomplishing daily activities that a CRCF would manage. As of March 2024, the State was providing supportive housing for 304 individuals and had the

capacity to support 326. This was a decrease from June 2022 when the State was providing 349 individuals with supportive housing and had the capacity to support 393.

64.     DMH targets limited supportive housing to individuals transitioning out of CRCFs. As of 2021, the State dedicated 15 supportive housing slots to individuals who are transitioning out of CRCFs.

65.     Assertive Community Treatment ("ACT") is a service that provides individualized support in the community to people with the most significant mental health needs, including those with a history of multiple inpatient admissions. The federal Substance Abuse and Mental Health Services Administration recognizes ACT as an evidence-based practice. ACT involves a team-based approach with small caseloads.

66.     Although the State Medicaid program began reimbursing providers for ACT as of July 1, 2023, the service is not available to everyone who needs it to transition from a CRCF because it is not available throughout the State. As of May 2024, DMH operated just two fully staffed ACT teams. There are three additional teams operated in the State by private mental health providers.

67.     Individualized, person-directed services aimed at enabling people to develop or regain independent living skills, sometimes provided through Psychosocial Rehabilitative Services, can promote recovery, full community integration, and improved quality of life for individuals with SMI. For example, this service may support people in developing skills related to communication, household management, and budgeting. This service should occur in the place where the person will typically be performing the skill, such as the person's home or workplace. These services are often especially critical in the period after a transition out of the hospital or a CRCF to support the development or re-development of community-living skills.

68.     In South Carolina, Psychosocial Rehabilitative Services are Medicaid-billable, and they can be provided individually or in a group. However, there appears to be wide variation by CMHC catchment area in how they are provided, with some offering the services primarily as a group activity and others providing it on an individual basis.

69.     Similarly, supported employment assists people with SMI to attain integrated, paid, competitive employment, and provides supports so that they are successful in that job, which can enable stability in the community and support successful transitions out of a CRCF. Individual Placement and Support ("IPS") is an evidence-based supported employment service. Since 2020, the State has required all 16 CMHC catchment areas to provide IPS supported employment.

70.     The State provides case management, which is Medicaid-billable, to many people with SMI, both in the community and in CRCFs. However, South Carolina's case management service rarely assists individuals in CRCFs with moving to an integrated setting or avoiding institutionalization. Instead, case managers generally provide therapy or referrals and do not promote transitions by directly assisting people to engage in intensive supports, locate housing, and access skill building services, even for people who have expressed a desire to move into integrated settings.

71.     Peer support specialists are individuals who have succeeded in their own recovery process, and then help others experiencing similar situations. Peers provide support by sharing their own lived experience and practical guidance. Peer support can be especially helpful when individuals with SMI are transitioning from institutions to integrated settings.

72.     While peer support can be central to transitions, about a third of the State's 51 full-time equivalent peer support specialist positions were vacant as of March 2024, leaving people in some regions without any available peer support specialists to help with transitions.

    B. *Expansion of Existing Services to Enable Transitions is Reasonable*

73.     The State could expand the capacity of existing community-based services to meet the needs of people who want to transition out of or avoid CRCF placement. For example, the State could expand supportive housing, ACT, peer support, supported employment, individualized independent living skills, and case management.

74.     It is reasonable for the State to expand these services because it has chosen to cover most of them through its Medicaid program. South Carolina has established systems to provide these services statewide, though some are not actually available throughout the state. In addition, the State already provides these services to some people with significant needs in the community.

75.     Serving South Carolinians with SMI in the community is a cost-effective alternative to institutionalization. The State has invested millions of dollars in serving people with SMI in CRCFs and can shift that funding to provide alternative services that would support those individuals in the community.

76.     Between state fiscal years 2017 and 2022, the State spent an average of $19 million per year on OSS, and $7 million per year on OSCAP. As of state fiscal year 2022, the average monthly expenditure per person for OSS and OSCAP was $756, or approximately $9,000 annually.

77. In contrast, the State's investment in supportive housing is limited. The State allocates approximately $2,350,000 annually for supportive housing, with an average cost of between $6,000 and $7,000 per person served.

78. Additionally, beginning in February 2019, the State committed to develop 30 to 40 units per year of supportive housing for a period of five years and set aside $6.5 million to meet this goal.

C. *Providing Timely Support for Transitions Is Reasonable*

79. The State can provide South Carolinians with SMI with information about the option to transition to an integrated setting. This would include conducting regular in-reach at CRCFs to identify individuals who are interested in transitioning to integrated housing, identifying their need for alternative services to support transition, and conducting comprehensive transition planning to support their moves.

80. The State can promptly transition all adults with SMI living in CRCFs who do not oppose community placement, and for whom such placement is appropriate, to the alternative community-based services they need to be successful post-transition.

### VIOLATION OF TITLE II OF THE ADA, 42 U.S.C. §§ 12131–34

81. The allegations of Paragraphs 1 through 80 of this Complaint are hereby realleged and incorporated by reference.

82. Defendant, the State of South Carolina, is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1).

83. South Carolinians who are Medicaid-eligible adults with SMI that live in CRCFs, or seek admission to a CRCF in the future, are persons with disabilities covered by Title II of the ADA,

and they are qualified to participate in the State's services, programs, and activities, including home and community-based services. 42 U.S.C. §§ 12102, 12131(2).

84. Community-based services are appropriate for the vast majority of CRCF residents with SMI and those seeking CRCF admission.

85. Many CRCF residents with SMI would not oppose receiving services in community-based settings.

86. The State violates the ADA by administering its service system for individuals with SMI in a manner that fails to ensure that they receive services in the most integrated setting appropriate to their needs. 42 U.S.C. § 12132.

87. Providing services to these individuals in the most integrated setting appropriate to their needs can be accomplished by making reasonable modifications to the State's system of providing mental health services.

88. The State's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132.

## REQUEST FOR RELIEF

The United States of America respectfully requests that the Court:

(A) Declare that the State of South Carolina has violated Title II of the ADA, 42 U.S.C. §§ 12131–34, by failing to administer its services, programs, and activities for adults with SMI in the most integrated setting appropriate to their needs.

(B) Enjoin the State of South Carolina to:

1. cease discriminating against adults with SMI, and instead provide them community-based services in the most integrated setting appropriate, consistent

with their individual needs;

2. take steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of Defendant's unlawful conduct.

(C) Order other appropriate relief as the interests of justice may require.

**Dated:** December 9, 2024                              Respectfully submitted,

ADAIR F. BOROUGHS                                        KRISTEN CLARKE
United States Attorney                                   Assistant Attorney General
District of South Carolina

WILLIAM JORDAN                                           REGAN RUSH
Civil Chief                                              Chief
                                                         Special Litigation Section

                                                         DEENA FOX
                                                         Deputy Chief
                                                         Special Litigation Section

_/s/ Robert Sneed_
ROBERT SNEED (#7437)                                     KYLE STOCK (NM Bar No. 141653)
Assistant United States Attorney                         SARAH STEEGE (MD No. 1306190292)
U.S. Attorney's Office                                   Trial Attorneys
District of South Carolina                               Special Litigation Section
55 Beattie Place, Ste. 700                               Civil Rights Division
Greenville, SC 29601                                     U.S. Department of Justice
Tel: (864) 283-2100                                      950 Pennsylvania Avenue, N.W.
robert.sneed@usdoj.gov                                   Washington, D.C. 20530
                                                         Tel: (202) 532-3880
                                                         Facsimile: (202) 514-0212
                                                         kyle.stock@usdoj.gov

                                                         *Counsel for Plaintiff United States of America*

19