IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| United States of America, | Civil Action No. 3:24-7125-CMC |
| Plaintiff, | |
| vs. | **ORDER** |
| State of South Carolina, | |
| Defendant. | |

The United States has sued the State of South Carolina ("the State" or "South Carolina") under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165, claiming the State "administers and funds its programs and services for adults with [serious mental illness] in a manner that results in their unnecessary institutionalization." ECF No. 1 at 1. South Carolina now moves to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(1), (6), and (7). ECF No. 15. It argues the Attorney General of the United States lacks authority to sue under Title II, the State itself is not a proper defendant, and the Complaint seeks "impermissibly broad relief." *Id.* at 16. For the reasons discussed below, the court denies South Carolina's motion.

**LEGAL STANDARDS**

A.     **Rule 12(b)(1)**

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) "addresses whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [its] claim." *Holloway v. Pagan River Dockside Seafood*, 669 F.3d 448, 452 (4th Cir. 2012). A defendant may challenge subject-matter jurisdiction either facially or factually. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). A facial challenge argues the

complaint "fails to allege facts upon which subject matter jurisdiction can be based," while a factual challenge contends "the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). When, as here, a defendant raises a facial challenge, the court "accept[s] the facts of the complaint as true as [it] would in context of a Rule 12(b)(6) challenge." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018).

**B.     Rule (12)(b)(6)**

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In deciding a Rule 12(b)(6) motion, the court "accept[s] the factual allegations of the complaint as true and construe[s] them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).

**C.     Rule 12(b)(7)**

Rule 12(b)(7) provides a case may be dismissed for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Rule 19, in turn, "sets up a two-step inquiry." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 950 (4th Cir. 2020) (internal quotation marks omitted). The court first

asks whether the absent party is "required" under Rule 19(a).  *Gunvor SA v. Kayablian*, 948 F.3d 214, 218 (4th Cir. 2020).  A party is required if: (1) "the court cannot accord complete relief among existing parties" in the party's absence, or (2) "disposing of the action" without the absent party would "impair or impede [its] ability to protect [its own] interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1).  If the absent party is required but cannot be joined — for example, because its presence would destroy jurisdiction — the court then considers the four factors listed in Rule 19(b) to determine whether "the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b).

## DISCUSSION

South Carolina makes three main arguments in moving to dismiss the Complaint.  First, the State argues the United States "lacks authority, and thus standing, to sue" under Title II of the ADA.  ECF No. 15 at 2.  Second, it submits the Complaint should be dismissed for failure to plausibly allege redressability and failure to join required parties under Federal Rule of Civil Procedure 19.  And third, it contends dismissal is warranted because the Complaint "seeks sweeping relief that is incompatible with Title II and principles of federalism."  *Id.* at 16.  The court addresses each argument in turn, beginning with South Carolina's jurisdictional challenges.

3

**A.      The Attorney General may sue to enforce Title II of the ADA.**

    1.     <u>Congress authorized suits by the Attorney General by incorporating the "remedies, procedures, and rights" of the Rehabilitation Act and Title VI into Title II.</u>

Congress passed the ADA in 1990 "after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). Drawing from its extensive research, Congress found society had historically "tended to isolate and segregate individuals with disabilities" and that "despite some improvements," disability discrimination "continue[d] to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). People with disabilities faced not only "outright intentional exclusion" and "segregation" but also "relegation to lesser services, programs, activities, [and] benefits," often with "no legal recourse." *Id.* § 12101(a)(4)–(5). Such discrimination "persist[ed]" in nearly all "critical areas" of life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3). After making these findings, Congress declared the purpose of the ADA: to establish a "comprehensive national mandate" under which "the Federal Government plays a central role" in enforcing "clear, strong, [and] consistent" standards designed to address "the major areas of discrimination faced day-to-day by people with disabilities." *Id.* § 12101(b)(1)–(4).

The ADA is divided into three titles, each prohibiting discrimination in a different context — Title I covers employment, Title II covers public services, and Title III covers public accommodations. *Id.* §§ 12112, 12132, 12182. Title II, at issue here, provides, "no qualified

4

individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.  The term "public entity" includes "any State or local government," as well as "any department, agency, . . . [or] instrumentality of a State . . . or local government." *Id.* § 12131(1)(A)–(B).

Title II's enforcement provision is found at 42 U.S.C. § 12133.  It declares the "remedies, procedures, and rights set forth in [§ 505 of the Rehabilitation Act] shall be the remedies, procedures, and rights [Title II] provides to any person alleging discrimination on the basis of disability." *Id.* § 12133.  Section 505, in turn, provides the "remedies, procedures, and rights set forth in [T]itle VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act" by an entity subject to the Rehabilitation Act.  29 U.S.C. § 794a(a)(2).  The upshot of this "series of cross-references" is that "the enforcement mechanism for Title II of the ADA is ultimately Title VI." *United States v. Florida*, 938 F.3d 1221, 1227 (11th Cir. 2019) (*Florida I*).  Given this, the question becomes whether Title VI permits the Attorney General to bring a civil enforcement action.  The answer to that question, as the court explains below, is yes: Title VI (and by extension, Title II) contemplates a remedial scheme authorizing the Attorney General to sue to enforce its prohibition against discrimination.

Title VI prohibits "any program or activity receiving Federal financial assistance" from discriminating on the basis of race, color, or national origin.  42 U. S. C. § 2000d.  It directs funding agencies to "effectuate" this mandate by issuing regulations and allows them to "effect[]" "[c]ompliance" with the statute by terminating funding or taking "any other means authorized by

5

law." *Id.* § 2000d-1.  Within months of Title VI's enactment, agencies introduced regulations outlining an administrative complaint process for individuals alleging discrimination — a process that could culminate in the Department of Justice ("DOJ") bringing "appropriate proceedings" in court if "informal means" of compliance were unsuccessful.  29 Fed. Reg. 16,241, 16,274–16,309 (Dec. 4, 1964).  The following year, President Johnson tasked DOJ with coordinating Title VI enforcement across federal departments and agencies.  Exec. Order 11247, 30 Fed. Reg. 12327 (Sept. 24, 1965).  Under that authority, DOJ issued guidelines specifying compliance with Title VI could be achieved by "appropriate court action" and instructing agencies not to "reject[]" the "possibility of court enforcement . . . without consulting [DOJ]."  28 C.F.R. § 50.3(c)(1)(B)(1).

Over the next two-and-a-half decades, DOJ routinely brought enforcement actions to address Title VI violations, and courts uniformly recognized its authority to do so. *See, e.g.*, *Nat'l Black Police Ass'n v. Velde*, 712 F.2d 569, 575 (D.C. Cir. 1983); *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 612–13 (5th Cir. 1980); *United States v. Tatum Indep. Sch. Dist.*, 306 F. Supp. 285, 288 (E.D. Tex. 1969); *United States v. El Camino Cmty. Coll. Dist.*, 454 F. Supp. 825, 826 (C.D. Cal. 1978); *United States v. Louisiana*, 692 F. Supp. 642, 649 (E.D. La. 1988), *vacated on other grounds*, 715 F. Supp. 606 (E.D. La. 1990); *United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276, 1521 n.154 (S.D.N.Y. 1985).  "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978).  Thus, by providing "person[s] alleging discrimination" under Title II the "remedies, procedures, and rights" set out in the Rehabilitation

6

Act and Title VI, 42 U.S.C. § 12133, Congress endorsed the longstanding interpretation that those "remedies, procedures, and rights" include the ability to file an administrative complaint that may result in suit by the Attorney General.[1]

Section 12133's neighboring provision reinforces the conclusion Congress intended to incorporate Title VI's administrative enforcement framework, including the potential for Attorney General suits, into Title II. Section 12134 requires the Attorney General to "promulgate regulations" that are "consistent with" the Rehabilitation Act's "coordination regulations" found in "part 41 of title 28, Code of Federal Regulations." 42 U.S.C. § 12134(a)–(b). One such coordination regulation directs federal agencies to "establish a system for the enforcement" of the Rehabilitation Act that "shall include . . . [t]he enforcement and hearing procedures that the agency has adopted for the enforcement of [T]itle VI." 28 C.F.R. § 41.5(a)(1). By its plain text, then, §

---

[1] To the court's knowledge, every court to consider the issue — apart from one now-reversed district court decision — has concluded the Attorney General may enforce Title II through litigation. *See Florida I*, 938 F.3d at 1250; *United States v. Mississippi*, No. 3:16-CV-622-CWR-FKB, 2019 WL 2092569, at *2–3 (S.D. Miss. May 13, 2019), *rev'd on other grounds*, 82 F.4th 387 (5th Cir. 2023); *United States v. Harris Cnty.*, No. 4:16-CV-2331, 2017 WL 7692396, at *1 (S.D. Tex. Apr. 26, 2017); *United States v. Virginia*, No. 3:12cv59–JAG, 2012 WL 13034148, at *2–3 (E.D. Va. June 5, 2012); *Smith v. City of Phila.*, 345 F. Supp. 2d 482, 489–90 (E.D. Pa. 2004); *United States v. City & Cnty. of Denver*, 927 F. Supp. 1396, 1399–1400 (D. Colo. 1996).

The court also notes the United States has entered into dozens of consent decrees and settlements with state and local governments since the ADA's passage. *See* U.S. Dep't of Just., *ADA Enforcement, Title II (Cases 1992 – 2005)*, https://archive.ada.gov/enforce_archive.htm#TitleII (last visited Mar. 27, 2025); U.S. Dep't of Just., *ADA Enforcement, Title II (Cases: 2006 – June 2022)*, https://archive.ada.gov/enforce_current.htm#TitleII (last visited Mar. 27, 2025); U.S. Dep't of Just., *Olmstead Enforcement*, https://archive.ada.gov/olmstead/olmstead_enforcement.htm (last visited Mar. 27, 2025).

12134 contemplates an administrative enforcement scheme that is "consistent" with the one established under Title VI — i.e., a scheme that allows the Attorney General to bring an enforcement action if an agency is unable to secure voluntary compliance. 42 U.S.C. § 12134(b).

    2.    <u>The Attorney General's authority to enforce Title II is not dependent on being a "person alleging discrimination."</u>

In resisting the conclusion Title II provides for the possibility of Attorney General enforcement, South Carolina argues the Attorney General cannot sue under Title II because the United States does not qualify as a "person alleging discrimination." ECF No. 15 at 2–4; *see Return Mail, Inc. v. U.S. Postal Serv.*, 587 U.S. 618, 626 (2019) (noting the "longstanding interpretive presumption that 'person' does not include the sovereign" (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780–81 (2000))). That argument, however, "rests on a misunderstanding" of "the Attorney General's role in this lawsuit." *United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 733 (11th Cir. 2021) (*Florida II*) (Jill Pryor, J., respecting denial of rehearing en banc). "When the Attorney General sues under Title II, the 'person alleging discrimination' is the individual with a disability" — in this case, the South Carolinians with serious mental illness the United States claims have been unnecessarily institutionalized. *Id.* at 737. And as explained, one of the "remedies, procedures, and rights" Title II provides these individuals is the ability to initiate an administrative enforcement process that "may culminate in the filing of a lawsuit by the United States government against a public entity to vindicate [their] rights." *Id.* at 737 n.5. That the United States itself does not qualify as a "person" under § 12133 is beside the point.

8

3. <u>Textual differences between the ADA's three titles do not undermine the Attorney General's authority to sue under Title II.</u>

In a second textual argument, South Carolina maintains because Titles I and III of the ADA explicitly name the Attorney General in their enforcement provisions, the absence of any such reference in § 12133 means Congress did not intend to grant the Attorney General authority to sue public entities under Title II. ECF No. 15 at 5–6. To be sure, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress" did so intentionally. *Russello v. United States*, 464 U. S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F. 2d 720, 722 (5th Cir. 1972)). But that general presumption is overcome here. "[W]ith each title of the ADA, Congress was legislating upon a different existing statutory framework." *Florida II*, 21 F.4th at 742 (Jill Pryor, J., respecting denial of rehearing en banc). "Thus, the different language Congress used in the enforcement provisions of each title merely reflects the different approaches that Congress took to incorporate existing law." *Id.*; *see also City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435–36 (2002) ("The *Russello* presumption . . . grows weaker with each difference in the formulation of the provisions under inspection.").

Title I's enforcement provision states:

The powers, remedies, and procedures set forth in sections [705, 706, 707, 709, and 710] of [Title VII of the Civil Rights Act] shall be the powers, remedies, and procedures [Title I of the ADA] provides to the [Equal Employment Opportunity] Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability.

9

42 U.S.C. § 12117(a). Because the five cross-referenced Title VII provisions assign different "powers, remedies, and procedures" to the EEOC, the Attorney General, and persons alleging discrimination, it was necessary for Congress to specify each actor when incorporating those "powers, remedies, and procedures" into Title I. "No similar reference to the Attorney General . . . was needed in Title II because the pre-existing statutes that Congress was incorporating there had simpler enforcement schemes that did not involve the sharing of 'powers,' between the Attorney General and the EEOC." *Florida II*, 21 F.4th at 742 (Jill Pryor, J., respecting denial of rehearing en banc) (internal citation omitted).

The explicit reference to the Attorney General in Title III likewise does not suggest the Attorney General lacks enforcement power under Title II. Title III's enforcement provision contains two subsections. Subsection (a), through a cross-reference to the Civil Rights Act, provides for a private cause of action and "permit[s] the Attorney General to intervene" in certain cases but limits available remedies to injunctive relief. 42 U.S.C. §§ 12188(a)(1), 2000a-3(a). Subsection (b), however, expands the federal government's authority to enforce Title III by empowering the Attorney General to initiate civil actions and seek monetary damages on behalf of aggrieved persons. *Id.* § 12188(b). Because Congress "created a new, expanded role for the Attorney General" in subsection (b), it "necessarily had to describe that role rather than incorporat[e] an earlier provision by reference" like it did in Titles I and II. *Florida II*, 21 F.4th at 744 (Jill Pryor, J., respecting denial of rehearing en banc).

10

4. <u>The clear statement rule does not apply.</u>

Invoking the Supreme Court's decision in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), South Carolina next argues the Attorney General lacks authority to sue the State under Title II because Congress did not make its intent to alter the "usual constitutional balance" between the States and the federal government "unmistakably clear." ECF No. 15 at 11.

In *Gregory*, the Supreme Court considered whether a provision in the Missouri Constitution setting a mandatory retirement age for judges violated the Age Discrimination in Employment Act ("ADEA"). The Court acknowledged "[c]ongressional interference" with Missouri's decision to impose a mandatory retirement age on its judges "would upset the usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. And so to "avoid a potential constitutional problem," the Court reasoned it would "not read the ADEA to cover state judges unless Congress ha[d] made it clear that judges are included." *Id.* at 464, 467 (emphasis removed). Applying this clear statement rule, the Court ultimately held Missouri's judges were not covered by the ADEA because it was "at least ambiguous" whether they fell within an exception to the statute's definition of "employee." *Id.* at 467.

In contrast to *Gregory*, allowing the Attorney General to proceed with this lawsuit would not "upset the usual constitutional balance of federal and state powers." *Id.* at 460. "The submission to judicial solution of controversies arising between [the United States and a state] . . . does no violence to the inherent nature of sovereignty." *United States v. Texas*, 143 U.S. 621, 646 (1892); *United States v. Mississippi*, 380 U.S. 128, 140 (1965) ("[N]othing in [the Eleventh Amendment] or any other provision of the Constitution prevents or has ever been seriously

11

supposed to prevent a State's being sued by the United States."). Indeed, it is well understood "the States surrendered their immunity from suit by the Federal Government" when they ratified the Constitution. *Chao v. Va. Dep't of Transp.*, 291 F.3d 276, 280 (4th Cir. 2002) (collecting cases). Accordingly, *Gregory*'s clear statement rule has no application here.

**B.     The United States has shown redressability, and "complete relief" can be accorded without joining additional parties.**

South Carolina also argues the case should be dismissed for lack of redressability and for failure to join required parties because the Complaint names only the State as a defendant, "without specifying any officer or agency that would have the authority or capacity to provide relief." ECF No. 15 at 13. The court disagrees. Contrary to South Carolina's suggestion, the entities responsible for funding and overseeing its mental health services system are not some independent actors over which the State has no control; rather, they are "integral arms of the State" itself. *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 308 (4th Cir. 2008). If the United States were to prevail in this case, South Carolina would be able to implement the relief granted through "the subsidiary state agencies and state officials that carry out its official business."[2] ECF No. 18 at 15; *see* Fed. R. Civ. P. 65(d)(2) (providing an injunction may bind "the

---

[2] Federal courts can and do enjoin states directly. *See, e.g.*, *Pennsylvania v. West Virginia*, 262 U.S. 553, 624 (1923) (enjoining "the defendant state[] and her several officers, agents and servants" from "enforcing, or attempting to enforce," an unconstitutional law); *United States v. Texas*, 340 U.S. 900, 901 (1950) (enjoining "[t]he State of Texas, its privies, assigns, lessees, and other persons claiming under it" from engaging in certain activities); *United States v. Louisiana*, 340 U.S. 899, 899 (1950) (same with respect to Louisiana); *United States v. Arizona*, 703 F. Supp. 2d 980, 1008 (D. Ariz. 2010) ("preliminarily enjoining the State of Arizona and [its] Governor"

parties"; "the parties' officers, agents, servants, employees, and attorneys"; and any "other persons who are in active concert or participation" with them). Therefore, a decision favorable to the United States would redress its injuries, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and provide it with "complete relief," Fed R. Civ. P. 19(a)(1)(A); *see also* 4 James Wm. Moore et al., *Moore's Federal Practice* § 19.03[2][a] (3d ed. 2025) (explaining joinder under Rule 19(a)(1)(A) "is aimed at ensuring that courts do not enter . . . judgments that do not effectively resolve the parties' entire controversy").

**C.     The scope of relief sought by the Complaint does not warrant dismissal.**

Finally, South Carolina contends dismissal is appropriate because the Complaint seeks "sweeping [injunctive] relief that is incompatible with Title II and principles of federalism."[3] ECF

---

from enforcing certain provisions of a challenged law); *United States v. Alabama*, 443 F. App'x 411, 420 (11th Cir. 2011) (enjoining "the State of Alabama's enforcement" of a challenged law pending appeal); Final Judgment, *United States v. South Carolina*, No. 2:11-2958-RMG (D.S.C. Mar. 4, 2014), ECF No. 153 (permanently enjoining the "State of South Carolina," as well as its Governor and Attorney General, from "implementing" certain provisions of a challenged law); *United States v. Missouri*, 660 F. Supp. 3d 791, 809 (W.D. Mo. 2023) (enjoining "Missouri and its officers, agents, and employees and any others in active concert with such individuals" from "implement[ing] and enforce[ing]" a challenged law), *aff'd*, 114 F.4th 980 (8th Cir. 2024).

[3] For reference, the United States asks the court to

(A)     Declare that the State of South Carolina has violated Title II of the ADA, 42 U.S.C. §§ 12131–34, by failing to administer its services, programs, and activities for adults with [serious mental illness] in the most integrated setting appropriate to their needs.

(B)     Enjoin the State of South Carolina to:

13

No. 15 at 14–16.  The United States responds that the challenge to its requested relief is both "improperly raised and premature at the motion to dismiss stage."  ECF No. 18 at 21.  Although the court is not unmindful of the "sensitive federalism concerns" at play in this case, *Horne v. Flores*, 557 U.S. 433, 448 (2009), it ultimately agrees with the United States.

Federal courts have "a 'virtually unflagging obligation' to hear and resolve questions properly before [them]."  *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 240 (2024) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  And given "the scope of injunctive relief is dictated by the extent of the violation *established*," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added), it would be premature to dismiss the Complaint without first affording the United States the opportunity to sketch the contours of the State's alleged violations.  *Cf. Timothy B. v. Kinsley*, No. 1:22-cv-1046, 2024 WL 1350071, at *9 (M.D.N.C. Mar. 29, 2024) ("While Defendants raise a compelling issue — the court's role, if any, in mandating change in the foster care system — this court will 'cross the bridge of remedies only when the precise contours of the problem have been established' later in these proceedings." (quoting *O'Shea v. Littleton*, 414 U.S. 488, 510 (1974) (Douglas, J., dissenting)));  *Jonathan R. by*

---

        1.      cease discriminating against adults with [serious mental illness], and instead provide them community-based services in the most integrated setting appropriate, consistent with their individual needs;
        2.      take steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of Defendant's unlawful conduct.
(C)     Order other appropriate relief as the interests of justice may require.

ECF No. 1 at 18–19.

*Dixon v. Justice*, 41 F.4th 316, 334 (4th Cir. 2022) ("[H]alting the litigation on this record would be premature. Should the district court determine that certain specific relief would overstep *Younger*'s bounds, it can always reject it to secure our comity interests.").

## CONCLUSION

For the reasons discussed above, South Carolina's motion to dismiss (ECF No. 15) is denied.

**IT IS SO ORDERED.**

s/Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
April 1, 2025

15